**B.F. JOHNSON, Plaintiff,**

**v.**

**CITY OF TARPON SPRINGS and Keith R. Bergstrom, in his official capacity as Chief of Police and individually, Defendants.**

**No. 89–1634–CIV–T–17C.**

United States District Court,
M.D. Florida,
Tampa Division.

March 19, 1991.

John A. Shahan, Tarpon Springs, Fla., for plaintiff.

Luis Prats, Christa L. Collins, Blasingame, Forizs & Smiljanich, P.A., St. Petersburg, Fla., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on Defendant's, motion for summary judgment, filed September 9, 1990, and response thereto, filed December 20, 1990.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party, not assessing the probative value of any evidence. *Hayden v. First National Bank of Mt. Pleasant,* 595 F.2d 994, 996–97 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.,* 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986):

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.,* at p. 324, 106 S.Ct. at p. 2553, 91 L.Ed.2d at p. 274.

In this case, the Court is satisfied there are no material facts at issue. Defendant's motion is well-taken, well supported and is hereby incorporated by reference.

Plaintiff raises two grounds in his complaint alleging violation of his civil rights: (1) Plaintiff asserts a violation of due process under the Fourteenth Amendment and that his property rights to a supervisory position, pursuant to 42 U.S.C. § 1983, were violated when he was reassigned to special projects without cause, without notice and without hearing; further, his demotion due to weight was a violation of equal protection under the Fourteenth Amendment. (2) Plaintiff claims under 42 U.S.C. § 1983 that he was deprived of his liberty interest in a good reputation as an efficient and productive police supervisory employee, as secured by the Fourteenth

Amendment of the United States Constitution. Plaintiff further alleges that Defendants' statements about Plaintiff's job incompetence and overweight condition violated his liberty interests.

█ In this Court, Plaintiff is barred from relitigating issues of fact determined by a state administrative hearing, when it is acting in a judicial capacity to resolve issues of fact properly before it and the parties have a full and fair opportunity to litigate. *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). This preclusive effect prevents this Court from re-hearing the now undisputed facts Plaintiff presents in his complaint to support his claims.

█ The same parties in this case received an administrative hearing pursuant to Article III, Section 1(a) of the Tarpon Springs Civil Service Board Rules and Regulations, regarding Plaintiff's termination. *B.F. Johnson v. City of Tarpon Springs*, Case No. 90–1030, June 20–22, 1990. It is clear from the transcripts that the hearing officer acted in a judicial capacity, that the parties were represented by counsel and had an opportunity to present witnesses and argument, introduce exhibits, testify and cross-examine witnesses. At this hearing, Hearing Officer Conn, of the Department of Administrative Hearings, determined the factual issues based on Plaintiff's employment history with the City of Tarpon Springs, his job performance, the actions of his superiors, and Plaintiff's response to those actions. These are the same factual issues that are material and necessary to the complaint before this Court. The twenty-six undisputed facts determined at this hearing are found in the September 26, 1990, recommended order, as adopted by the Civil Service Board of the City of Tarpon Springs, Florida, on October 23, 1990.

1. On or about October 22, 1968, the Petitioner began his employment with Respondent's Police Department as a police officer, reaching the position of second in command in the early 1970s. At all time material hereto, the Petitioner has held the rank of Captain, reporting directly to the Chief of Police as second in command of the Police Department. The duties of Captain include: (a) the supervision and coordination of subordinate personnel engaged in law enforcement activities; (b) planning, organizing, evaluating and directing personnel involved in station and field operations; (c) evaluating assigned personnel for efficiency and effectiveness; (d) reviewing all reports for accuracy; (e) representing the Police Department at civic, community and law enforcement meetings; (f) determining situations requiring personal attention and exercising optional command over dispatch operations; and (g) supervising general direction and procedures of investigative actions. In addition, other duties may be assigned to the Captain by the Chief.

2. Blain LeCouris was the Chief of Police from 1975 to 1985. During the latter years of his tenure as Chief, LeCouris observed a reduction in Petitioner's performance in 1984 while he was serving as Acting City Manager and Petitioner was in charge of the day to day operations of the Police Department. Petitioner was frequently absent from duty, and could not be reached. LeCouris removed certain training duties from Petitioner because of his dissatisfaction with his performance, and reassigned them to a subordinate officer.

3. From August 1985 until April 1987, Carl Hernandez served as Chief of Police. During this time, the Petitioner did not carry out his duties in a satisfactory manner. He needed constant supervision and was regularly absent without explanation, showed little initiative, had a careless attitude, and was suspended for two days over an incident involving the police dispatcher. Hernandez removed certain administrative duties from Petitioner's

**1476**

inability to get things done in a timely manner.

4. William Lyght served as Interim Chief from July to October 1987, and during this time he formed the opinion that Petitioner was a very poor administrator who could not meet deadlines, or communicate effectively with the public or others in the Police Department. He observed Petitioner sleeping in his office while on duty on three or four occasions, and regularly had difficulty finding him. Lyght testified that Petitioner did not have a "common grasp" of his position or its duties. He counseled Petitioner about his performance, as well as his excessive weight which he felt was hindering Petitioner's performance, but he did not discipline Petitioner since he was only serving on an interim basis.

5. On October 27, 1987, Keith R. Bergstrom was appointed Chief of Police. Within his first few months as Chief, Bergstrom met with Petitioner on several occasions about his dissatisfaction with Petitioner's performance, including specifically his inattention to detail, absences, sloppiness of appearance and of work product, and his inability to direct and organize the employees of the Police Department.

6. On January 11, 1988, an incident involving a hostage occurred in the City of Tarpon Springs. Petitioner was not at the hostage scene, and did not come to the scene when notified by telephone of the incident. Rather, Petitioner attempted to exercise partial command via the telephone from his home, and did not clearly delineate who was in charge at the scene. He testified that he was unable to come to the hostage scene because he was suffering from severe diarrhea, and his feet and legs were swollen badly.

7. Chief Bergstrom verbally counseled Petitioner about this incident and wrote him a memorandum requesting his answers to specific questions about Petitioner's handling of this matter. In his written response, petitioner incorrectly numbered several paragraphs, and in several places used incorrect words or spellings. The Petitioner has admitted that he has trouble with paper work, and with communications, either verbal or written.

8. On February 2, 1988, Chief Bergstrom again counseled Petitioner, and wrote him a memo confirming the fact that on January 27, 1988, Petitioner had failed to carry out a specific instruction to seek out information, brief police officers, and provide for the proper supervision of the repossession of an automobile. Additionally, he was instructed to keep his beeper on while at home when he was serving as Acting Chief in Bergstrom's absence since there had been an incident on February 2, 1988, when Chief Bergstrom was out of town and the Petitioner could not be reached either by telephone or beeper.

9. On March 10, 1989, Chief Bergstrom evaluated Petitioner's performance from October 1987 to October 1988, and issued a warning and a directive to correct deficiencies involving the quality and quantity of Petitioner's work, his ability to work with others, absenteeism and tardiness, and his personal demeanor. Petitioner's work was characterized as untimely, sloppy, inaccurate and incomplete. Bergstrom noted that Petitioner was unwilling to make decisions, or to accept responsibility for those he did make. Petitioner required constant, close supervision in order to get any work done, and Bergstrom concluded that Petitioner had to make "major improvements" in every evaluation category.

10. Following this evaluation, Petitioner's work did not improve. Chief Bergstrom continued to counsel him about his performance, and ordered him to take a forty hour management course.

11. On March 7, 1989, Petitioner was reprimanded because he had a City vehicle repaired prior to obtaining a purchase order, contrary to standard pro-

cedure. Petitioner offered as an explanation of his action that he wanted to return the vehicle to service as soon as possible, and that he felt the job had been done at the lowest possible cost to the City.

12. On August 14, 1989, Chief Bergstrom wrote Petitioner a memo informing him that an auxiliary officer associated with the Police Department, who had been hired by the Petitioner while he was Acting Chief, had been arrested that day on three counts of the sale and possession of cocaine. Chief Bergstrom requested some background information on this auxiliary officer's hiring. In response, Petitioner wrote that the position of auxiliary officer "is not a sworn position", and that this officer was only a "helping officer." Petitioner's response evidences that he did not understand the nature of the position of auxiliary officer, nor the need to make more complete background checks of such officers before they are hired.

13. In his position as Captain, Petitioner was responsible for the payroll, and in that capacity had been authorizing the payment of premium holiday pay whether an employee worked one hour on a holiday or some longer period. Chief Bergstrom became concerned about this practice because, at times, work on a holiday would only constitute part of a shift. He felt that premium pay should only be paid for that part of a shift falling on a holiday, and the remainder of the shift should be paid at the regular rate of pay. In response to Bergstrom's concerns, the Petitioner wrote a memo on September 7, 1989, stating that to his knowledge there was no set policy on the subject, and that if an officer worked any part of his shift on a holiday, it had been his practice to pay the officer for his entire shift at a premium pay, if the officer requested such a payment. Because the Petitioner had been in charge of payroll ever since Bergstrom had become Chief, Bergstrom felt that a uniform policy on this subject should already have been developed.

14. As a result, in the Fall of 1989, Chief Bergstrom directed Petitioner to develop a payroll manual so that there would be definite, uniform policies to cover all payroll functions. Bergstrom changed Petitioner's assignment and placed him in charge of "special projects" in order to give him time to devote to this project almost exclusively, and also because Petitioner had announced his intention to run for the City Council. Deadlines were established by Bergstrom for Petitioner's completion of this manual, but at Petitioner's request these deadlines were extended several times. Finally, on January 3, 1990, Chief Bergstrom directed that Petitioner turn over to him whatever work he had completed on the manual. After two months, the document was not close to being in final form. This failure to complete an assigned project was consistent with Petitioner's performance on other special projects assigned to him, which ultimately required Chief Bergstrom to take more time correcting errors and checking for completeness than if he had done the entire project himself.

15. Patricia Haynes is the secretary in the Chief's officer who worked with both the Chief and the Captain. She testified that she observed Petitioner sleeping at his desk and by the coffee pot during the workday on several occasions, and that Petitioner was frequently hard to find during the workday.

16. It was the established policy of the Police Department to require all employees to report outside employment. This policy was initially set forth in a memo from then-Chief Hernandez in April 1985, and was confirmed in March 1989, through a memo from the Personnel Department reminding all employees of this policy. On December 15, 1989, the Petitioner completed a Notification of Outside Employment

form in which he indicated he had begun outside employment delivering newspapers at night in October 1989. In fact, Petitioner began employment delivering newspapers with the St. Petersburg Times on May 27, 1989. Although he indicated to Chief Bergstrom that he had been unaware of this established policy, Petitioner had been Captain of the Police Department and second in command from the initial inception of this policy. Other officers of lower rank who Petitioner identified as also having failed to comply with this policy, contradicted his testimony and stated that they had, in fact, filed the appropriate notification form.

17. Rule 8 of the City's Personnel Rules and Regulations has been in effect and has remained the same at all times material hereto, requiring all employees to provide information about outside employment prior to beginning employment. The failure to furnish such information is deemed an infraction and a separate cause for dismissal.

18. On October 30, 1987, Chief Bergstrom directed Petitioner to lose weight to a level appropriate to his height and age. Petitioner informed Bergstrom that he was about to begin an extensive weight loss program, including counselling, which might take up to two years to complete. The Chief indicated that if requested by Petitioner he would recommend that Petitioner be given financial assistance for this program. It was the opinion of Bergstrom that Petitioner was not physically fit to perform his duties and that his physical appearance engendered disrespect for his rank and the Police Department as a whole.

19. Petitioner is between 5 feet 8½ to 5 feet 10 inches tall, and his birthdate is June 24, 1942. During the time when William Lyght served as Interim Chief, Petitioner's weight exceeded 400 pounds. Approximately one month prior to the hearing on this matter, Petitioner's weight was found to be 346 pounds, according to Maurice Bonilla, M.D. At all times material hereto, Petitioner has been severely overweight, with a weight that is not appropriate for his height and age.

20. In early 1988, Petitioner enrolled in the weight loss program at Total Fitness, Inc., and according to Dean Cosgrove, who was accepted as an expert in weight counselling, Petitioner weighed 383 pounds at the beginning of this program, and by April 1988, his weight had been reduced to 341½ pounds. To achieve this weight loss, Petitioner was put on a liquid diet of 520 calories a day, with walking exercise. He had minimal side effects from this liquid diet according to Cosgrove. However, Petitioner discontinued the program from May 1988 to January 1989, when he reenrolled and was weighed at 373 pounds. In November 1988, Petitioner incorrectly informed Chief Bergstrom by memo that he was still on the weight loss program through Total Fitness, but that he had been taken off the liquid diet for health reasons. There is nothing in the record to substantiate Petitioner's memo of November 22, 1988, to Bergstrom concerning the status of his weight loss program. After resuming the program, Petitioner reduced his weight from 373 pounds in January 1989, to 348 pounds in March 1989. Cosgrove testified that he is unaware of any reason why Petitioner could not lose weight on the Total Fitness program. There is no record of Petitioner suffering from severe diarrhea while on the liquid diet program.

21. In September 1989, Petitioner enrolled in a different program to tone muscles and improve his appearance through a facility called Tender toning. At the start of this program, his weight was 338 pounds and in November, 1989, when he discontinued this program, his weight was 332 pounds.

22. Marcus Occhipinti, M.D., who was accepted as an expert in medicine, char-

acterized Petitioner as "excessively obese," and diagnosed him from his medical history as having "Pickwickian syndrome" which causes sudden, unexpected sleepiness during the day, and which can only be cured through weight loss. Dr. Maurice Bonilla characterized this condition as a disorder of obesity which causes a person to spontaneously fall asleep without warning. Dr. Bonilla did not diagnose Petitioner as having this condition. Dr. Occhipinti testified that he told Petitioner that had had Pickwickian syndrome on his first visit with him, but Petitioner denied he was ever told of this condition and does not feel he has it.

23. According to Dr. Bonilla, who was accepted as an expert in medicine and who specializes in the treatment of his risk obesity patients, 170 pounds is an appropriate weight for a person 5 feet 8 inches tall with a large frame like Petitioner's. An appropriate and reasonable goal weight for Petitioner would be 200 pounds, the goal suggested by Chief Bergstrom for Petitioner. Dr. Bonilla's experience in diagnosing and treating obese patients is far greater than Dr. Occhipinti's and therefore, Dr. Bonilla's testimony is found to have greater weight than that of Dr. Occhipinti. Even Dr. Occhipinti, however, testified that there is no medical reason why Petitioner cannot lose weight. It is found, therefore, that Petitioner's overweight condition is not due to any disability, including Pickwickian syndrome.

24. On December 27, 1989, Chief Bergstrom delivered to the Petitioner a direct order that he appear at Dr. Bonilla's officer on January 3, 1990, so that he could be weighed to determine what progress, if any, he had made in achieving any weight loss. The Petitioner did not keep this appointment. Prior to January 3, 1990, a law suit was initiated on Petitioner's behalf in Federal District Court, and a protective order was sought to prevent Petitioner from having to keep this ap-

pointment. On January 4, 1990, the day after the scheduled appointment, an Order was entered in Case No. 89–1634–CIV–T–17C which stayed the physical examination of Petitioner until further Order of the Federal District Court.

25. Chief Bergstrom has warned others in the Police Department about being overweight. Specifically, on February 9, 1989, Chief Bergstrom noted on his evaluation of Bobby Lockhart, Jr., a narcotics detective, that he had to reduce his weight. At that time, Lockhart, who is six feet tall, weighed 375 pounds. In response to counselling and a concerted weight loss program, by February 1990, Lockhart had reduced his weight to 277 pounds. Despite Petitioner's assertion that there are other overweight officers in the Police Department who have not been ordered to reduce their weight as he has been, no evidence was introduced to show that there are any sworn officers in the Tarpon Springs Police Department whose stature is even remotely comparable to Petitioner's. To the contrary, it appears that Petitioner's overweight condition was by far the most severe among officers in the Police Department, which was particularly problematic for the person holding the position of second in command. Chief Bergstrom reasonably felt that Petitioner's weight hindered him in the performance of his duties, and that others in the Police Department and the public may view Petitioner's overweight condition as an indication of his lack of concern or interest in his position, and an absence of willpower and a sense of accountability, and that his appearance could reasonably be expected to engender a lack of respect for him in his position as second in command and for the Police Department.

26. On January 9, 1990, Petitioner was informed that Chief Bergstrom had recommended that he be terminated, and he was given the right to respond

to Bergstrom's charges that he had violated Rules 18(1)(b) and (1)(k) of the City's Personnel Rules and Regulations. After considering Petitioner's responses through counsel to these charges, a Notice of Discharge and Statement of Charges was issued to Petitioner, dated January 15, 1990, and approved by the City Manager on January 19, 1990, based upon Rules 18(1)(b) and (1)(k). This dismissal was effective on January 19, 1990. Thereafter, Petitioner timely filed an appeal of this matter before the City's Civil Service Board pursuant to Rule 18(9), and the final hearing in this case was held by the undersigned at the request of the Civil Service Board and with the agreement of the parties.

As these twenty-six factual issues correspond to those presented in the Plaintiff's complaint now before this Court, the doctrine of preclusion justifies conclusive treatment of these facts by this Court. Plaintiff had recourse to appeal the decision of the Tarpon Springs Civil Service Board to the State Circuit Court. Tarpon Springs Civil Service Board Rules and Regulations, Article III, Section 4(k).

■ Plaintiff's claim that procedural due process guaranteed by the Fourteenth Amendment was violated when he was denied his property right to a supervisory position is without merit. Plaintiff must first prove he had a property right to a supervisory position and that he was denied this right by constitutionally inadequate process. *Hatcher v. Board of Public Education & Orphanage*, 809 F.2d 1546, 1548–1549 (11th Cir.1987). Plaintiff does not explain in his complaint the basis for his "property" right. Generally a property right in employment is through statute, ordinance, rules, personnel policies or "mutually explicit understandings" to maintain a supervisor level. *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1976). Because no property rights exist no procedural process is necessary to assign Plaintiff the duties of special payroll manual preparation project. Plaintiff held the rank of captain until termination.

In *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435, 102 S.Ct. 1148, 1156, 1157, 71 L.Ed.2d 265 (1982), the court found "some" form of hearing is required before an owner can be deprived of his property interest. Plaintiff received procedural due process prior to his discharge from employment (Plaintiff had a property interest in continued employment) at a predisciplinary conference on January 15, 1990, when he was given an opportunity to review and respond to charges against him.

*Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) holds that deprivation of one's property interest is not a violation of the Fourteenth Amendment due process clause so long as the state provides the deprived person a forum for redress of his grievance. Post deprivation procedural due process was afforded Plaintiff by a hearing officer at the Florida Department of Administrative Hearing on June 20–22, 1990.

■ Plaintiff's claim of deprivation of his liberty interest in a good reputation, as a productive employee, as secured by the Fourteenth Amendment is without merit. Procedural due process is not violated if the employee is provided a post-deprivation hearing to "clear his name." *Codd v. Velger*, 429 U.S. 624, 627–26, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977); *Buxton v. City of Plant City, Florida*, 871 F.2d 1037, 1046 (11th Cir.1989). At the administrative hearing on June 20–22, 1990, Plaintiff had an opportunity to refute the charges against him which injured his reputation. Plaintiff and his counsel had the opportunity to cross-examine and present witnesses, independent evidence, and testimony.

■ Plaintiff's claim of Fourteenth Amendment equal rights violation due to his demotion for being overweight, and that Plaintiff was on a special weight reduction program when no other overweight persons were, is also without merit. In *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), it was decided that equal rights protection, pursuant to 42

U.S.C. § 1983, is violated when similarly situated persons are treated differently and that different treatment is not rationally related to a legitimate state interest. Plaintiff as captain was second in command of the Tarpon Springs Police Department; there was no other officer within comparable rank, responsibilities or duties. Hence, there was no one "similarly situated" as to rank and responsibility with which to compare Plaintiff. However, there was an overweight detective in the department who was put on a weight reduction program by the Defendants. This, then would be dissimilar employees treated equally, which is contrary to Plaintiff's allegations.

■ Further, similarly situated employees can be treated differently without violating equal protection if that difference in treatment does not involve fundamental rights or a suspect classification. *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Defendants, even if there were similarly situated parties, did not violate equal protection if they had a rational basis for treating them differently. Holding the second officer in command to higher standards is rationally related to legitimate police department goals of furthering respect for the department with the community, setting a positive role model and enhancing the pride and moral of employees, as well as improving the Plaintiff's job performance.

■ Plaintiff's claim of substantive due process violation in Count I and Count II is also without merit. One must have a property right that is violated in order to sustain a substantive due process claim; and this violation of property interest must have been the result of improper motives, bad faith, or pretextual, arbitrary and capricious. *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982); *Kelly v. Smith*, 764 F.2d 1412, 1413 (11th Cir. 1985). Plaintiff did not have a property right which was violated when he was assigned to prepare a payroll manual. Plaintiff did have a property right to his employment. However, at the administrative hearing of June 20–22, Hearing Officer Conn determined that there was "just cause" for the termination of Plaintiff from his captain's position in the Police Department of the City of Tarpon Springs because of deficiencies in the performance of his duties. These finding of facts are documented as follows:

(1) Tarpon Springs Police Chiefs LeCouris and Hernandez, as well as Interim Chief Lyght, were dissatisfied with Johnson's performance. Because of this dissatisfaction, Chief LeCouris removed certain training duties from Johnson, and Chief Hernandez removed certain administrative duties from him. (Findings of Fact No. 2–4).

(2) Johnson did not come to the scene of a hostage incident, but instead attempted to exercise partial command by telephone. (Finding of Fact No. 6).

(3) Johnson has admitted he has difficulty with paperwork and communications, both oral and written. (Finding of Fact No. 7).

(4) Johnson had a City vehicle repaired contrary to standard departmental procedures. (Finding of Fact No. 11).

(5) Johnson failed to carry out a specific instruction to seek out information, brief police officers and provide for the proper supervision of the repossession of an automobile. (Finding of Fact No. 8).

(6) Although as acting chief he hired auxiliary officers, Johnson did not understand the nature of the position of auxiliary officers, nor the need to make more complete background checks of such officers prior to hiring them. (Finding of Fact No. 12).

(7) Johnson failed to develop a consistent policy with respect to premium holiday pay for department employees. (Finding of Fact No. 14).

(8) Chief Bergstrom's secretary, Pat Haynes, testified that she observed Johnson sleeping at his desk and by the coffee pot during the work day on several occasions, and that Johnson was frequently hard to find during the work day. (Finding of Fact No. 15).

1482

(9) Johnson violated the established policy of the Tarpon Springs Police Department requiring all employees to report outside employment. (Findings of Fact 16–17).

(10) It is undisputed that Johnson failed to comply with Chief Bergstrom's directive that he reduce his weight to a level appropriate to his height and age, even though Chief Bergstrom extended the deadline and ascertained that no medical reasons prevented Johnson from losing the weight.

For the reasons set forth above, this Court finds that Plaintiff's complaint for violation of his civil rights is without merit.

Accordingly, it is,

ORDERED that the motion for summary judgment be, granted, the petition to be dismissed, and the Clerk of the Court to be directed to enter judgment for Defendants City of Tarpon Springs and Keith R. Bergstrom, individually and in his official capacity, and against Plaintiff B.F. Johnson.

DONE and ORDERED in Chamber, in Tampa, Florida, this 19th day of March, 1991.